UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHLEEN GORDON,

     Plaintiff,

vs.                                      CIVIL NO.: 05-CV-73738-DT

COMMISSIONER OF                  HON. SEAN F. COX
SOCIAL SECURITY,                MAG. JUDGE WALLACE CAPEL, JR.

     Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**

It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for further fact finding consistent with this Report.

**II.**    **REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB] and supplemental security income [SSI]. Plaintiff filed for benefits on July 11, 2002,[1] alleging that she had been disabled and unable to work since July 1, 2001. (TR 46-52). The application was initially denied on December 26, 2002, and Plaintiff took no further action. (TR 29-33). Plaintiff filed a second application on April 18, 2003,[2]

---

[1] Plaintiff's Disability Determination and Transmittal form dates filing at July 12, 2002. (TR 27).

[2] Plaintiff signed the second application on April 25, 2003 (TR 55), but her Disability Determination and Transmittal form dates filing at April 28, 2003 (TR 28,). Further, her SSI application is dated July 19, 2004. (TR 354-56).

1

alleging that she was disabled and unable to work since July 1, 2001 (TR 53-55), due to reactions from air-borne environmental substances. (TR 67, 354-56). The Social Security Administration [SSA] denied benefits initially on June 11, 2003. (TR 28, 34-37). A de novo hearing was held on March 3, 2005, before Administrative Law Judge [ALJ] Thomas English. (TR 369-407) In a decision dated May 5, 2005, the ALJ found that although Plaintiff could not perform her past relevant work, she could do work that exists in significant numbers. (TR 10-22). Accordingly, Plaintiff was found not disabled. (TR 22). On August 7, 2005, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (TR 6-8). Plaintiff then appealed to district court.

### A.   PLAINTIFF'S TESTIMONY

Plaintiff testified that she was born April 16, 1964, and was forty years old at the time of the hearing. (TR 373). She is five feet, three inches, and weighs one hundred and twenty-five pounds. Id. She explained that her weight fluctuates and is currently on an increase. Id.

Plaintiff stated that she is divorced with her youngest child, a twelve-year-old, still living at home. (TR 374). Plaintiff reported that she currently lives on a friend's farm. Id. Previously, beginning in June 2004, she lived with her mother, until February 2005 when she moved to the farm. Id.

Plaintiff was suffering from migraine headaches around July 1, 2001, and Dr. Israel suggested that she apply for "social security." (TR 375). She stated that she receives child support, as well as financial benefits and food stamps from the state. Id. Plaintiff completed high school and one year of college, but she does not have a college degree. Id. She reported that she has not had any vocational or specialized training. Id.

She stated that she last worked, from home, in May 2001 as a tax preparer for Stone and Associates. (TR 375-76). She stated that she was working twenty hours per week at five dollars and

twenty cents an hour. (TR 376). She explained that the work was seasonal, and she worked intermittently from January 2000 through June 2001. Id. She found out about the job through a friend, and it required that she organize receipts and add them when needed. (TR 376, 399). She stated that although she had taken some accounting courses while in college, she had no other specialized training for the position. (TR 399).

Prior to the tax preparation, Plaintiff worked as a bank teller from September through December 1999. (TR 376-77). She was unable to maintain the job because of missed work due to illness. (TR 377, 391). She believed that her employer asked her to leave because of the missed work. (TR 391). She stated that when she did go to work, she would become sick and vomit. Id. There was exposure to the other tellers and to fumes from vehicles at the drive-up window. Id. She explained that the fumes from the cannisters at the drive-up window, as well as the smell of new money, bothered her. (TR 392). Often customers she waited on would have scents, for example from dryer sheets, that irritated her. Id. She could not wear the mask at work. Id. She was working full-time at six dollars and fifty cents an hour. (TR 376-77).

From September 1997 to November 1997 and April 1998 to May 1998, Plaintiff worked as a janitor. (TR 377). She explained that she only worked in two month intervals because she would get sick and need to take time off. Id. She worked six hours a day, five days per week, at seven dollars and twenty-five cents an hour. Id.

Plaintiff testified that, prior to her job as a janitor, she worked as a seed sower at a greenhouse for two months. (TR 377). However, she explained that forklifts inside the building released fumes that made her sick. (TR 378). She stated that this exposure resulted in a trip to the emergency room after work one day for carbon monoxide exposure. Id.

3

Plaintiff worked from December 1998 until April 1999 as a senior home aide, seven hours per day, five days a week, at seven dollars an hour. Id. She stated that she cleaned floors, made beds, helped with lunches, and was a companion. (TR 379). She lifted an eight to ten pound vacuum cleaner, which was the most difficult part of the job. Id. She stated that she had to quit because she kept getting ill and no one could fill in for her. (TR 378, 379).

From May 1996 to July 1996, Plaintiff worked as a full-time sewer/assembler in a factory at five dollars and fifty cents an hour. (TR 379). She reported that she fed and tended an industrial sewing machine, but she was not required to set it up. (TR 398). She stated that the heaviest weight that she lifted was five pounds. (TR 399).

Plaintiff testified that her two main limitations that preclude work are chronic fatigue syndrome [CFS] and multiple chemical sensitivity syndrome. (TR 379). She later explained that she cannot work because the drive to work, if other vehicles are around, would cause her to become ill during the day as would any perfumes that other workers might wear. (TR 389). In addition, if other workers or customers use scented dryer sheets on their clothing, she becomes ill and cannot complete the workday. (TR 392). She explained that when she encounters something that triggers her chemical sensitivity,

> [f]irst I feel it in the face area - - the nose, the forehead, the back of the neck - - or it's not even the back of the neck. It's that hollow spot at the very top of the neck. [It is a] definite pain. . . . that's what I call the epicenter or the worst spot is at the point on the back of the neck and there's a spot behind the right eye that hurts the worst and the rest of it radiates around.

(TR 390). She stated that once the pain starts, it continues even if she gets away from the source of exposure. Id. She does not dry clean her clothing because it irritates her skin in the same way that lotions irritate her skin. (TR 392).

Plaintiff was wearing a mask at the hearing. (TR 391). She stated that she wears a mask whenever she has to pump gas or go into a store. Id. She explained that it "it helps somewhat," and "[p]revents the fumes from - - chemicals and the fumes from getting into [her] body." Id.

She stated that she also saw Mr. Miller for depression, but has not treated with him since the summer of 2004. (TR 380). She testified that her migraine headaches are related to her multiple chemical sensitivity syndrome. Id. She explained that any petrol chemical product will cause a migraine headache. Id. Her headaches also cause her to forget things. (TR 393). For example, when she worked as a teller at the bank, she would forget simple things, and people would have to repeat instructions to her that she had learned earlier in the day. Id.

She stated that she also has pain in her neck, arms, and shoulders. (TR 380-81). She reported "various muscle pains throughout the body." (TR 381). She stated that on a scale of one to ten with ten requiring a visit to the emergency room, her pain is a two or three on average and "[w]ay over a ten" at its worst. (TR 381, 383). For example, if Plaintiff goes shopping, she is exposed to several petrol chemicals and becomes ill. (TR 381). She stated that a migraine headache will result lasting twenty-four hours to four days, requiring bed rest. (TR 381-82, see also 390, 394). Plaintiff believes that the petrol chemicals are the sole cause of her headaches. (TR 382).

She stated that her headaches are worse than childbirth, she sweats profusely, vomits, shakes, and only wants to sleep. (TR 394). However, she stated that she usually cannot sleep. Id. She curls up in a bed, turns out all the lights, and everyone tries to be quiet. Id. She stated that there are times when she wants to go to the hospital for her headaches, but there is no one to take her in. Id.

Plaintiff reported that her muscle pain and joint problems are constant. (TR 382). If she "ovderdo[es]" it, her condition worsens in the ensuing days. (TR 382-83). In comparison to her headaches, Plaintiff rated her muscle and joint pain as an eight. (TR 382).

Plaintiff stated that she has been treating with Dr. Camacho for over a year and he treats her for the chemical sensitivity, CFS, and headaches. (TR 383). She stated that he is going to start treating her depression at her next visit. Id. She stated that she has not been treated as an inpatient, but she has had to visit the emergency room. Id.

Plaintiff testified that she is not currently on any medications because she is "sensitive to every medication [she has] ever tried taking." (TR 384). For example, she tried anti-depressants, such as Zoloft and Wellbutrin, but they would make her "very depressed," and she "would think bad thoughts." Id. She stated that she also vomited after taking pain pills and antidepressants. (TR 385). Later, she stated that her doctor recommended that she take an herbal supplement, sublingual melatonin. (TR 393). She stated that she was taking the supplement, and it helped a little with her sleeping, but not as much as she had hoped. Id. She reiterated that medicine has not been helpful for her. Id. She stated that Epsom salt bath seemed to help with her muscle pain, but only temporarily. (TR 385).

She stated that her doctor noted that she needs unscheduled breaks every fifteen to twenty minutes every one or two hours. Id. She explained that during these breaks she uses the bathroom or rests. Id. She has muscle aches whether she is walking or writing. Id.

Plaintiff quit smoking two years prior to the hearing. Id. However, she use to live with her mother who smoked. Id. She stated that sometimes her mother's smoking would set off her chemical sensitivity, especially if another person was visiting and smoking, too. (TR 386). Plaintiff reported that she does not drink alcohol or do any illegal drugs. Id.

Plaintiff does some housework, including the laundry, dishes, cleaning, floors, and bathroom. Id. She stated that she shoveled snow once last winter. Id. Plaintiff reads and watches some television

(about two or three hours per day). (TR 386, 388). She stated that she does her own grocery shopping and takes care of her twelve year-old daughter. (TR 386-87).

However, she usually has someone drive her to get groceries and she gets a headache each time she goes into town to shop. (TR 395). She stated that the headache is worse in stores like Meijer where they have other products with the food. Id. The headache is not as bad in a store like Kroger. (TR 396). She stated that she still tries to avoid the laundry and baby aisles, which are scented. Id. If she is by herself, she will hold her breath down those aisles or ask a stranger for help. Id. She drives at least once a week to take her daughter to the a church youth group; she stated that she does not go to church or anywhere else "unless [she has] to," and she does not visit with friends or family. (TR 387).

However, she also reported that she has a couple of friends that she sees "[a] couple times a year." Id. She also visits with her mother once a month. Id. She stated that she has not gone to church since 1999, because she would get sick if someone near her wore perfume. (TR 388). She explained that she used to have a friend who supported her, but she no longer sees him now that she has relocated. (TR 396). She confirmed that she told a consultative examining doctor in 2002 that she has friends, cooks, and gardens. Id. However, she stated that she does not have many friends since moving, because she does not have the money for transportation to visit them. Id. Further, she stated that the scents in other people's home makes it difficult for her to visit them. (TR 396-97).

Plaintiff stated that she used to enjoy gardening, but has not been able to garden for the past four years. (TR 388). She stated that the only other hobby she enjoys is reading. Id. Plaintiff described a typical day:

> I try to get up around 8:00 or so. And it takes an hour or two to get unsore [sic]. Any my daughter's being home-schooled now, so I get her started on that. And if she has any questions, I'm there to help her out. And that's until about 2:00 or so. And then

> I'll try to do a little bit of housecleaning. I'll clean for just a few minutes, like the routine that seems to work pretty good for me is to work for about ten minutes and then rest for about five minutes. And if I do that off and on, I don't get too tired before I get the job done. That way I can at least get things done, rather than a lot of things halfway done.

(TR 388-89). Plaintiff cooks for her daughter and indicated that doing so is very time consuming, (TR 389). She stated that she spends her evenings reading, and her daughter often has friends come over to visit. Id. Plaintiff explained that this creates a problem because the girls all wear hair products, which are scented. Id.

### B.    MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment and the ALJs' decisions reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[3]

### C.    VOCATIONAL EXPERT'S TESTIMONY

Melody Henry, a VE, testified at the hearing. (TR 397-405). She classified Plaintiff's past work as follows: tax clerk, sedentary and unskilled; bank teller, light and semi-skilled; home care attendant, medium and unskilled; janitor, medium and unskilled; and industrial sewing machine tender, light and unskilled. (TR 400). The VE stated that as long as she worked at the unskilled position longer than two-weeks to thirty days, she would have had enough time to learn same. Id. However, the VE testified that it was not clear that as a part-time employee, whether Plaintiff compelted the typical three months of training that would make the job semi-skilled. (TR 401). Furthermore, the VE testified that she would not have transferable skills from that position. Id.

---

[3]Subpart E, infra, at 11.

The ALJ presented a hypothetical question to the VE regarding whether a hypothetical person was capable of "unskilled work with no exertional limitations and therefore, capable of working at any levels [sic] from very heavy, heavy, medium, light and sedentary, but with a further non-exertional limitation of requiring a clean environment with limited - - only limited contact with co-workers and the public." (TR 401). The VE testified that this hypothetical person would not be capable of doing Plaintiff's past work as it is typically performed. (TR 401-02). The VE explained that the position as a tax preparer was not performed typically, because working in the home would be considered an accommodation. Id. The ALJ asked if someone with Plaintiff's age, education, and work experience, whose RFC is as previously stated would be able to perform other jobs. (TR 402).

The VE testified that under these limitations, Plaintiff would be able to perform the following sedentary and unskilled jobs: telephone solicitor, 1,100 positions; administrative support worker, 1,250 positions; and visual surveillance monitor, 1,250 positions. Id. Further, the VE testified that such a claimant would be capable of performing the following reduced range of light, unskilled work: mailroom clerk, 1,575 positions; recording clerk, 1,070 positions; office machine operator, 1,110 positions; and file clerk, 1,725 positions. Id. The VE stated that higher exertional level work would fall outside the hypothetical due to the clean air environment limitation. Id. Further, she testified that regarding the positions "listed - -limited contact with a co-worker or public doesn't mean there would be no contact at all. There may be others within the same environment. Perhaps not consistently throughout the day, but there could be exposure to other workers." (TR 402-03).

The ALJ asked whether Plaintiff could perform any jobs if her testimony was accepted as fully credible. (TR 403). The VE testified that she could not do any work because she "testified to the migraines inducted by chemical sensitivities and indicated that when that occurs she has periods as little as eight hours up to possibly four days where she is essentially incapacitated and in bed and

9

unable to complete activities." Id.  The ALJ also asked whether the limitations by the treating physician relating to unscheduled breaks every one or two hours for fifteen to twenty minutes at a time would have an impact on competitive employment.  Id.  The VE stated that "the problem is the unscheduled nature of it.  Certainly, in any even unskilled employment, you can have a break every couple hours for ten to fifteen minutes.  I think the need for unscheduled breaks, if we're looking at unskilled employment, would preclude her ability to maintain employment." Id.  The VE testified that her testimony was consistent withe Dictionary of Occupational Titles [DOT].  (TR 403-04).  She also reported that she relied on United States Census data, the Michigan Occupational Information System, and the standard  industrial classification information.  (TR 404).

Plaintiff's counsel then questioned the VE.  (TR 404-05).  Plaintiff's counsel asked whether missing work more than three times per month as limited by the treating source, would impact employability.  (TR 404). The VE stated that in "the State of Michigan in unskilled employment one to two absences is about all that's allowed in a 30-day period." Id.  Plaintiff's counsel asked whether limitations by the doctor, including a workplace free from all dust, fumes, and gases, would impact the jobs listed.  Id.  The VE testified that she was not aware of any positions where dust could be completely eliminated; therefore, there would be no jobs for an individual who could not be around any dust.  (TR 405).

### D. ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that the medical evidence establishes "that the claimant has chronic fatigue syndrome and multiple chemical sensitivities, impairments that are 'severe' within the meaning of the Regulations," but that she does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4 .  (TR 17, 21).  The ALJ found that Plaintiff's

allegations regarding her limitations were not fully credible. (TR 18-19, 21). He determined that Plaintiff had the following RFC: "Claimant must work in a clean environment and only limited exposure to co-workers and the general public." (TR 21). Thus, the ALJ concluded that Plaintiff is not eligible for disability. (TR 22).

### E. ANALYSIS

Plaintiff advances several claims in her Motion for Summary Judgment. Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because (1) the ALJ violated SSR 96-8P in failing to consider the combined effects of all Plaintiff's impairments; (2) the ALJ violated SSR 99-2P in failing to consider Plaintiff's CFS and multiple chemical sensitivity symptoms as disabling; and (3) the ALJ failed to properly assess the opinions of Plaintiff's treating physician and treating psychological counselor.[4] In response, Defendant's Motion for Summary Judgment contends that the ALJ's decision is supported by substantial evidence.[5] The matter is now ready for decision.

#### 1. Standard of Review

This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g) (2006). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human

---

[4] Plaintiff's Motion for Summary Judgment and Brief filed January 24, 2006, (hereinafter "Defendant's Brief") at page 8.

[5] Defendant's Motion for Summary Judgment and Brief filed March 17, 2006, (hereinafter "Defendant's Brief") at pages 6-10.

11

Servs., 889 F.2d 679, 681 (6th Cir. 1989). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Applying these standards, I will analyze each of Plaintiff's claim.

### a. SSR 96-8P

Plaintiff argues that the ALJ violated SSR 96-8p when he failed to consider the effects of all Ms. Gordon's impairments on her ability to work.[6] It is true that "[i]n evaluating the evidence regarding [Plaintiff]'s impairments . . . in this circuit they must be viewed in combination." Mowery v. Heckler, 771 F.2d 966, 971 (6th Cir. 1985). Further, "[d]isability may be established by a claimant suffering from a variety of medical problems no one of which might be sufficiently disabling to prevent substantial gainful employment, but when taken together have that result." Id. (citing Hurst v. Schweiker, 725 F.2d 53 (6th Cir.1984); Allen v. Califano, 613 F.2d 139 (6th Cir. 1980)). In addition, "[w]hen multiple impairments are involved, the assessment of RFC reflects the restrictions resulting from all impairments (both severe and not severe impairments). This assessment is based on all relevant evidence pertaining to RFC consistent with appropriate clinical and laboratory findings." Titles II and XVI: The Sequential Evaluation Process, SSR 86-8p, 1986 WL 68636, at *5.

---

[6]Plaintiff's Brief at pages 10-12.

12

Specifically Plaintiff alleges that the ALJ failed to include her headaches in the RFC.[7] Defendant argues that the ALJ accommodated her headaches because he limited her to working in a clean environment and limited contact with coworkers.[8] Defendant further points out that Plaintiff testified that when she is able to avoid irritants, she does not experience headaches.[9] (TR 395). Plaintiff argues that the ALJ found that on one occasion that "headaches were not bothering her," (TR 19, 277) and that was the reason for excluding headaches from his RFC.[10]

Plaintiff testified that "[i]f I don't go out anywhere and I'm not exposed to anything, I won't have a headache." (TR 395). Further, on the occasion that the doctor noted that she was not having headaches, this was a single isolated event. (TR 277). On Plaintiff's previous appointment, six days earlier, she complained of a "bad headache." (TR 276). Further, as Plaintiff points out, in December 2004, a month earlier, she also came in for a follow up due to headache. (TR 283). Nonetheless, the ALJ's comment regarding the isolated event was in relation to his credibility finding, which Plaintiff does not challenge. Additionally, the ALJ did limit Plaintiff to a clean environment, as Defendant notes, which would take into consideration her headaches caused by same.

Plaintiff points to her doctors' reports that she has headaches.[11] However, these reports were detailed by the ALJ. Further, the mere diagnosis of an impairment says nothing about the severity of same. See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (citing Foster v. Bowen, 853 F.2d 483, 489 (6th Cir.1988) (diagnosable impairment not necessarily disabling)).

---

[7] Plaintiff's Brief at pages 11-12.

[8] Defendant's Brief at page 10.

[9] Defendant's Brief at page 9-10 (citing TR 395).

[10] Plaintiff's Brief at page 12 (citing TR 19, 277).

[11] Plaintiff's Brief at pages 11-12 (citing TR 230, 248, 258, 294, 317, 321-25)

13

       **b.**     **SSR 99-2P**

Plaintiff also argues that the ALJ failed to find her severe impairments of CFS and multiple chemical sensitivity disabling pursuant to 99-2p.[12] Essentially, Plaintiff's argument is that the ALJ dismissed her impairments because they were not supported by objective medical evidence.[13] Plaintiff argues that neither CFS or multiple chemical sensitivity can be proven with objective medical evidence.[14] The undersigned agrees. However, Plaintiff does not show that she meets the medical criteria for either impairment; rather she generally summarizes the proper evaluation of same generally. The ALJ found that the her CFS and multiple chemical sensitivity were severe impairments, and he did discuss her treatments records form Dr.'s Israel, Natzke and Camacho.[15] (TR 15-17). Nonetheless, the ALJ rejected Dr. Camacho's finding of disability, which is more fully discussed below.

       **c.**     **Treating Physician and Psychologist**

Plaintiff argues that the ALJ failed to properly assess her treating physician's and treating psychologist's opinions.[16] This Court is well aware that the medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted. King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (citations omitted).

---

[12] Plaintiff's Brief at pages 12-15.

[13] Plaintiff's Brief at page 14.

[14] Plaintiff's Brief at pages 14-15.

[15] Plaintiff argues that "[h]er treatment records from Drs. Israel, Natzke and Camacho all show exaggerated reactions to fumes, foods and medicine." Plaintiff's Brief at page 15. However, Plaintiff fails to cite to the record.

[16] Plaintiff's Brief at pages 15-20.

14

> The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.

Bankston v. Comm'r of Soc. Sec., 127 F. Supp. 2d 820, 824 (E.D. Mich. 2000). The determination of disability is the prerogative of the Secretary, and not the treating physician. Kirk v. Sec'y Of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981); Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 855 (6th Cir. 1986); 20 C.F.R. § 404.1527.

An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques. 20 C.F.R. § 404.1527(d)(2). Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded those opinions if they are simply conclusory. Houston v. Sec'y of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King, 742 F.2d at 973). In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings." Giddings v. Richardson, 480 F.2d 652, 656 (6th Cir. 1973). See also Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir. 1990) (ALJ not required to defer to treating physician where there is substantial evidence to the contrary)). Further, it is important to keep in mind that the Regulations clearly state that, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(e)(1).

In Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544, (6th Cir. 2004), the Sixth Circuit found that

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

Id. (citations omitted).

The ALJ in the present case did not give controlling weight to the opinion of Dr. Camacho. (TR 19). The ALJ further stated that, "Dr. Camacho said the claimant was totally and permanently disabled with the inability to work due to multiple chemical sensitivity disorder and chronic fatigue syndrome; however, there are no clinical or laboratory diagnostic techniques to support these diagnoses. Id. Clearly the ALJ did not apply the factors in Wilson.

However, it is possible under Wilson dicta to have harmless error.

> [i]f a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal. Cf. NLRB v. Wyman-Gordon, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant. Or perhaps a situation could arise where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons- even though she has not complied with the terms of the regulation.

Wilson, 378 F.3d at 547. In this case, Defendant argues that Dr. Camacho is not even a "'treating' physician at the time he completed this form, as he had seen Plaintiff only once."[17] Defendant is referring to an earlier statement by Dr. Camacho. (TR 294). However, the ALJ relied on Exhibit 15F, page 11, in rejecting the opinion. (TR 19, 285). This Exhibit is dated August 30, 2004, and

---

[17]Defendant's Brief at pages 8-9.

16

correctly states that Dr. Camacho has been treating Plaintiff since February 2004. (TR 285). Plaintiff point s out that Dr. Camacho saw Plaintiff nine times between February and October 2004.[18] An examination of the frequency of treatment is something required by Wilson. 378 F.3d at 544. This is just one factor that the ALJ neglected.

Further, it bears repeating that when Plaintiff's counsel asked whether limitations by the doctor including a workplace free from all dust, fumes, and gases, would impact the jobs listed, the VE testified that there were not any positions where dust could be completely eliminated. (TR 404-05). Thus, the ALJ's decision, which does not comply with the doctor's limitations, could not constitute harmless error in that regard. Defendant argues that the limitation to a clean work environment is consistent with the state agency physicians' opinions.[19] However, as Plaintiff notes,[20] the ALJ rejected the opinions of the state agency, stating "[t]he undersigned has not given controlling weight to these opinions because the opinions are those of non-examining physicians and they are not consistent with the record, including additional evidence, when considered in its entirety. These opinions are, however, consistent with the ultimate finding that the claimant is not disabled." (TR 21).

Meaningful appellate review of the ALJ's assessment of the treating physician's opinion is impossible. Defendant failed to regard Dr. Camacho as a treating physician, let alone make an argument for harmless error or address *any* analysis under Wilson. Remand is necessary.

---

[18]Plaintiff's Reply at page ii.

[19]Defendant's Brief at pages 7-8.

[20]Plaintiff's Reply at page i.

Plaintiff also argues that the ALJ failed to defer to the opinion of her treating psychologist, Craig Miller.[21]  However, Mr. Miller follows his signature with ACSW, which signifies that he is a social worker with the Academy of Certified Social Workers.  (TR 252-61).  An ALJ *may* consider the opinion of a social worker under the regulations.  See 20 C.F.R. § 416.913(a); 20 C.F.R. § 416.913(d) (emphasis added).   The ALJ did discuss Mr Miller's treatment notes and a Psychiatric Review Technique Form that he also filled out.  (TR 16).  The ALJ stated that he gave

> little weight to the opinion of Mr. Miller in Exhibit 14F.  Mr. Miller completed a Psychiatric Review Technique Form and said the claimant had marked difficulties in social functioning and marked difficulties in maintaining concentration, persistence, or pace; however his opinions are not supported by the evidence as a whole.  The claimant has said she has friends who support her and visits with friends and family.  She is also able to go shopping, do basic household chores, and home schools her daughter which contradicts Mr. Miller's assessment that she has marked limitations in maintaining concentration, persistence, or pace.

(TR 18).  This assessment by the ALJ is not improper under the Regulations.  See 20 C.F.R. § 416.913(a); 20 C.F.R. § 416.913(e).

### 2.    Remand Versus Benefits

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff.  It is firmly established that under § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted).  More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."  Id. (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

---

[21]Plaintiff's Brief at page 18.

The ALJ did not properly analyze the treating physician's opinion. However, remand for benefits would be premature given the record and the subjective nature of the complaints yet to be analyzed.

### III.     CONCLUSION

For the reasons stated, I respectfully recommend that the court **GRANT** Plaintiff's Motion for Summary Judgment in part, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case to the Defendant Commissioner for further fact-finding consistent with this Report.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation, they may serve and file specific, written objections. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the Court in its discretion, may enlarge the period of time in which to file objections to this report.

                                                                   s/Wallace Capel, Jr.
                                                                   **WALLACE CAPEL, JR.**
                                                                   **UNITED STATES MAGISTRATE JUDGE**

**Dated:**   October 3, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>October 3, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  <u>Janet L. Parker and Charles A. Robison,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>.

                                               <u>s/James P. Peltier</u>
                                               United States District Court
                                               Flint, Michigan 48502
                                               810-341-7850
                                               E-mail: pete_peltier@mied.uscourts.gov